UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

F I L E D

AUG 0 5 2011

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA

v.

JASON W. SMIEKEL
Algonquin, Illinois
(Name and Address of Defendant)

**CRIMINAL COMPLAINT**

CASE NUMBER:

11 CR 5 0 0 5 5

I, SARAH A. TUCKER, the undersigned complainant being duly sworn, state the following is true and correct to the best of my knowledge and belief:

On or about August 2, 2011, in Elgin, in the Northern District of Illinois, Jason W. Smiekel did knowingly use a facility of interstate commerce, namely a cellular telephone, with the intent that a murder be committed in violation of the laws of the State of Illinois, with something of value, namely money, being received and promised to be paid in consideration for the murder, in violation of 18 U.S.C. § 1958.

I further state that I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives and that this complaint is based on the facts set forth in the attached affidavit.

Continued on the attached sheet and made a part hereof:  x  Yes  _ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

August 5, 2011
Date

at Rockford, Illinois
City and State

P. Michael Mahoney, Magistrate Judge
Name & Title of Judicial Officer

_____
Signature of Judicial Officer

NORTHERN DISTRICT OF ILLINOIS )
                                        ) ss.
WESTERN DIVISION               )

## AFFIDAVIT

I, Sarah A. Tucker, being duly sworn, depose and state the following:

1.     I am a Special Agent ("S/A") for the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), United States Department of Justice, and have been so employed since September 2003. I am currently assigned to the Rockford Satellite Office, conducting investigations involving the unlawful possession and/or sale of firearms and narcotics. My formal education includes a B.A. in Criminology received from Northern Illinois University and an M.A. in Law Enforcement and Justice Administration from Western Illinois University. I have also successfully completed the Criminal Investigator Training Program and the ATF New Professional Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia.

2.     This affidavit is submitted in support of the issuance of a complaint against JASON W. SMIEKEL for using an interstate commerce facility in the commission of a murder-for-hire, in violation of Title 18, United States Code, Section 1958. I make this affidavit with personal knowledge based on my participation in this investigation, including witnesses I interviewed or which were interviewed by other law enforcement agents, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience. The information outlined below is provided for the limited purpose of

1

establishing probable cause and does not contain all of the details or facts relating to this investigation of which I am aware.

3. This Affidavit describes portions of recorded and unrecorded conversations. To the extent that such communications are summarized, those summaries do not necessarily refer to all of the topics covered during the conversation. In addition, the summaries do not include every conversation made by each speaker on the topic being described. Portions of the conversations that are quoted are preliminary quotations and may be modified upon further review. For some conversations, I have offered in parentheses my understandings and/or interpretations of the conversation. My understandings and/or interpretations are based upon my experience and knowledge of the investigation to date, the content and context of the conversations, the experience of other ATF Special Agents with whom I have consulted, and my training and experience as a Special Agent.

### The Cooperating Individual

4. On Saturday, July 30, 2011, ATF S/A Dan Ivancich and I met with a cooperating individual (hereafter the "CI") who provided the following information:

    a. On Wednesday, July 27th, 2011, he had been approached by an individual he knows as "Jason." Jason drives a white Lexus and resides on Sandy Creek Drive in Algonquin, Illinois. Jason said he wanted to have an individual (hereinafter referred to as "intended victim") murdered in order to prevent the intended victim from giving damaging testimony in a proceeding.

2

b. Jason is an attorney and had recently represented his girlfriend in her divorce case. Jason indicated his girlfriend's ex-husband, the intended victim, has information about Jason that could get Jason in trouble and lead to a criminal indictment. Jason had wanted to have the intended victim killed prior to a court appearance that was scheduled to be held on Friday, July 29, 2011.

c. Jason said he previously paid two males a total of $8,000 to murder the intended victim, with the understanding that an additional $7,000 would be paid upon completion of the task. Jason indicated that the two males took off with the $8,000 and never committed the murder. Jason asked if the CI could "get it done" and Jason indicated that he was willing to pay up to $25,000 for the murder.

d. On Thursday, July 28, 2011, Jason again approached the CI. Jason asked, "What do you got for me?" and stated, "I'm willing to do the 25. What do you need?" Jason reiterated that the intended victim has evidence that would completely destroy Jason and that Jason needed something done by the following day. The CI told Jason that nothing would happen that quickly. On Friday, July 29, 2011, Jason called the CI's cell phone. Jason indicated that he had been able to buy himself more time in regard to the court date.

5. The CI showed S/A Ivancich and me the call log on the CI's cellular phone and advised that Jason had used phone number (815) 909-5500 to call the CI. The CI indicated that Jason had called the CI two times on the morning of July 30, 2011, but the CI had not answered the phone. In looking at the CI's telephone, I

3

observed two missed calls from (815) 909-5500 which were received at 9:26 a.m. and 10:50 a.m. on July 30, 2011.

6. The CI agreed to make a recorded phone call to Jason in order to attempt to arrange for another meeting. In the presence of agents, the CI made a recorded call to (815) 909-5500, and then indicated that the call went to voicemail. Approximately thirty minutes later, the CI advised me that he had received a call from Jason, who had relayed that he was currently out of town but would be willing to meet the following day.

7. I conducted an inquiry of Lexis/Nexis, an informational database, and learned that JASON W. SMIEKEL was associated with the same address on Sandy Creek Drive in Algonquin, Illinois, as had been provided by the CI. A driver's license inquiry confirmed that SMIEKEL fit the physical description provided by the CI. When I showed the CI a photograph of JASON W. SMIEKEL that I had obtained though the driver's license inquiry, the CI positively identified the photograph as the individual the CI knew as Jason. The CI advised that he has known Jason as an acquaintance for 4 to 5 years.

### July 31, 2011 Meeting

8. On Sunday, July 31, 2011, the CI advised S/A Ivancich and me that the CI had spoken with SMIEKEL earlier that day and that the CI had asked if they could meet that evening. I looked at the call log on the CI's phone and it indicated an outgoing call to (815) 909-5500 at 11:10 a.m. and an incoming call from (815) 909-5500 at 11:16 a.m. At approximately 6:16 p.m., at my request, the CI made a recorded

4

phone call to (815) 909-5500 and spoke with SMIEKEL. During the call, SMIEKEL said he was currently unavailable but could meet with the CI at 8:00 p.m. that evening. Later that day, S/A Ivancich and I gave the CI two covert recording devices to use during the meeting. We told the CI to advise SMIEKEL that the CI knew an individual named "Chris" who would be willing to complete the task (referring to the murder for hire) that SMIEKEL had discussed.

9. On the evening of July 31, 2011, the CI had a recorded meeting with SMIEKEL. After the meeting, S/A Ivancich and I met with the CI. The CI turned over the recording equipment to S/A Ivancich, and provided a piece of torn white paper with handwriting in blue ink. The CI said SMIEKEL had written the intended victim's name on the piece of paper along with a phone number that "Chris" was to use to contact SMIEKEL. The piece of paper contained the intended victim's name, address in McHenry County, Illinois, and place of employment. The piece of paper also contained telephone number (213) 509-0487. The CI said that SMIEKEL still wanted to pay someone to kill the intended victim and had written the intended victim's name and address on the provided piece of paper. The CI said SMIEKEL had again discussed how he had tried to have this done (via the previously mentioned unknown males) in February 2011. SMIEKEL said he wanted it completed by Friday, August 5, 2011. SMIEKEL was receptive to meeting with "Chris" and requested that "Chris" call SMIEKEL on the phone number on the piece of paper. I reviewed the recordings of the meeting between the CI and SMIEKEL. While the audio was recorded, the video did not record the meeting. While reviewing the audio recording

5

of the meeting, I confirmed the information provided by the CI during the debriefing. During the meeting SMIEKEL said his last name was SMIEKEL. SMIEKEL again indicated that the intended victim was about to "ruin" SMIEKEL and that SMIEKEL had been reported to the ARDC. I know from my experience and training that ARDC is commonly used to refer to the Attorney Registration and Disciplinary Commission. SMIEKEL asked about the proposed cost saying, "I need to be ready money-wise."

10. On Monday, August 1, 2011, I conducted an online query in the McHenry County Circuit Clerk Online Public Case Access system. The system indicated that the intended victim is currently listed as a defendant in a family court matter in McHenry County. I also conducted an online query of the Attorney Registration & Disciplinary Commission which lists SMIEKEL as a licensed attorney in the State of Illinois. However, under the heading of "Public Record of Discipline and Pending Proceedings" was listed "none".

### August 1, 2010, ATF Undercover Meeting

11. On Monday, August 01, 2011, ATF S/A Chris Bayless, acting in an undercover capacity posing as a "hitman," called cell phone number (213) 509-0487 and spoke with SMIEKEL. During the recorded conversation, SMIEKEL agreed to meet that evening at a restaurant on Randall Road in Elgin, Illinois. At approximately 6:50 p.m., S/A Bayless entered the parking lot at the restaurant. S/A Bayless called SMIEKEL on the cellular phone and described the type of vehicle S/A Bayless was in. Shortly thereafter, SMIEKEL walked out of a restaurant and got into S/A Bayless's undercover car. S/A Bayless and SMIEKEL drove around. I have

6

reviewed the video and audio recordings of the meeting and the following summarizes the meeting:

    a.    SMIEKEL introduced himself as "Jason" and got into S/A Bayless's car. S/A Bayless asked SMIEKEL what he had going on. SMIEKEL said there was a guy who was causing SMIEKEL family problems and problems with his livelihood. SMIEKEL said six months ago he had foreseen troubles and had gone to someone else, but that SMIEKEL had been ripped off. S/A Bayless said that he wasn't sure whether he wanted the job but that for the right price, anything could get taken care of.

    b.    SMIEKEL said he had a time problem and that the intended victim had "dirt" on SMIEKEL that could ruin SMIEKEL'S career. SMIEKEL said there was no other solution (meaning that the victim had to be killed). SMIEKEL identified the locations of the intended victim's place of employment and health club. S/A Bayless said it would cost about "twenty" (meaning $20,000). SMIEKEL discussed how he could obtain the money to pay S/A Bayless and agreed to pay $1,500 of the fee up front. SMIEKEL described the physical appearance of the intended victim and agreed to provide a photograph of the intended victim to S/A Bayless. They agreed to meet the following day at the same restaurant.

### August 2, 2011 ATF Undercover Meeting

12.    On August 2, 2011, at approximately 11:39 a.m., S/A Bayless received a telephone call from (213) 509-0487. S/A Bayless did not answer and the

7

call went to voicemail. He activated a recording device and called SMIEKEL back at (213) 509-0487. SMIEKEL indicated he was running late and would be at the restaurant at approximately 12:45 p.m. At approximately 12:39 p.m., SMIEKEL used cellular number (213) 509-0487 to call S/A Bayless. During the call, SMIEKEL indicated that he had arrived at the restaurant. S/A Bayless entered the parking lot in an undercover vehicle and parked. S/A Bayless went into the restaurant, met briefly with SMIEKEL, and they both went to S/A Bayless's car. The meeting was recorded both for audio and video. I have reviewed the video and audio recordings of the meeting and the following summarizes the meeting:

a. SMIEKEL had obtained a different phone and had S/A Bayless use his cell phone to call SMIEKEL'S new phone number, (818) 235-3945. SMIEKEL gave S/A Bayless an envelope containing a small photograph of the intended victim and $1,500 in currency. S/A Bayless said he had already put "things in motion," and that he planned on making it look like the murder stemmed from a robbery. SMIEKEL said that he would have part of the money on Friday and they discussed how SMIEKEL would later pay the remainder. S/A Bayless said that he would call SMIEKEL when "it's done" (meaning the murder had been committed).

b. S/A Bayless said that if he got an earlier opportunity to kill the intended victim, he would take advantage of that and would call SMIEKEL after the murder. SMIEKEL agreed to get $5,000 to pay S/A Bayless as early as the following day. Otherwise, S/A Bayless would try to kill the intended victim by Thursday and

8

SMIEKEL agreed to try and pay S/A Bayless $10,000 right after the murder with the rest of the fee to be paid later. The meeting ended with S/A Bayless saying he would call SMIEKEL when the intended victim was dead.

**August 4, 2011**

13. Beginning at approximately 2:05 p.m. on August 4, 2011, S/A Bayless and SMIEKEL had a series of telephone calls with SMIEKEL using the cell phone (818) 235-3945. During these calls, S/A Bayless asked whether SMIEKEL had the money and SMIEKEL said that he had $7,000. S/A Bayless asked whether SMIEKEL wanted to drive by the scene of the murder in order to confirm that the intended victim had died and SMIEKEL indicated that he did not want to do so. SMIEKEL said that he trusted S/A Bayless and would provide the $7,000 up front. They agreed to meet at the same restaurant on Randall Road at 4:30 p.m. later that day.

14. At approximately 4:17 p.m., S/A Bayless and SMIEKEL met in a parking lot of the restaurant on Randall Road in Elgin, Illinois. SMIEKEL got into S/A Bayless's vehicle and gave an envelope containing $7,000 in United States currency to S/A Bayless. After discussing how SMIEKEL would pay the rest of the fee for the murder, S/A Bayless gave the arrest signal, and ATF special agents then arrested SMIEKEL.

**Interstate Facilities**

15. According to a computer search for the service providers for the cellular telephones that SMIEKEL used to call and to receive calls from S/A Bayless,

telephone numbers (213) 509-0487 and (818) 235-3945, the service provider for both telephones is New Cingular Wireless PCS, LLC, now AT&T on the Web, an international telecommunications company. Each cellular telephone was a facility of interstate commerce.

## Conclusion

16. Based on the above information, I have probable cause to believe that JASON W. SMIEKEL has utilized a facility of interstate commerce, namely a cellular telephone, with the intent that a murder be committed in violation of laws of the State of Illinois, with something of value, namely money, being received and promised to be paid in consideration for the murder, in violation of Title 18, United States Code, Section 1958.

*Sarah A. Tucker*
Sarah A. Tucker
Special Agent
Bureau of Alcohol, Tobacco, Firearms, and Explosives

SUBSCRIBED TO AND SWORN TO BEFORE ME THIS 5th DAY OF AUGUST, 2011.

P. MICHAEL MAHONEY
United States Magistrate Judge
Northern District of Illinois, Western Division